UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAROLD BURGER,

        Plaintiff,

v.                                                                        Case No. 10-15053
                                                                          Honorable Patrick J. Duggan

IDIDIT, INC.,

        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On December 20, 2010, Plaintiff Harold Burger ("Plaintiff") filed this lawsuit against his former employer, Ididit, Inc. ("Ididit"), alleging that he was unlawfully terminated based on his sex and in retaliation for his complaints about sex discrimination in violation of Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act.  Presently before the Court is Ididit's motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 on August 15, 2011.  The motion has been fully briefed and the Court held a motion hearing on October 12, 2011.

## I.      Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S. Ct. at 2513.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

## II.     Factual and Procedural Background

2

Ken and Jane Callison, husband and wife, started Ididit in 1986. Ididit manufactures customized steering wheel columns for hot rods and street rods and sells other related equipment. Ken and Jane Callison each own 40% of the corporation. Their son and daughter, Scott Callison and Kimberly Johnson, each own 10% of the corporation. Each of the owners (collectively "the Callisons") is active in the business.

Ididit hired Plaintiff as a sales representative in 2003. At the time and throughout his employment, Plaintiff was supervised by the sales manager, Marty Waterstraut ("Waterstraut"). Some time after Plaintiff was hired, Ididit hired a third sales representative. In 2006, Kellie Weaver "(Weaver") assumed the third sales representative position.

The sales representatives at Ididit worked in the "front office" along with the office manager, Celeste Lamoreaux ("Lamoreaux"), and customer service representative, Lorrie Brown ("Brown"). Jane Callison, who served as Ididit's President, worked primarily in the front office. Ken and Scott Callison worked in Ididit's manufacturing section.

The basic duties of the sales representatives were to take orders from customers that arrived via facsimile, telephone, or e-mail, meet customers in Ididit's showroom, answer phone calls from customers or potential questions, and attend car shows where Ididit marketed its products. Throughout Plaintiff's employment, the desk of the third sales representative always was closest to the fax machine and consistently that sales representative had the highest "sales statistics." (*See* Pl.'s Resp. Ex G, Ex. H ¶ 14; Ex. I.)

3

From its inception until 2008, Ididit experienced steady and strong growth in sales without the need for sales representatives to engage in solicitation of sales or "cold calls." In 2008, in line with the recession in the national economy, Ididit's sales stopped growing and began decreasing significantly. In response, Jane Callison issued a "New Directive in Sales" to the sales staff. (*See* Def.'s Mot. Ex. E Att. 1.) This memo encourages sales employees to actively seek business rather than wait for sales calls to come into the office. (*Id.*) As part of this directive, each of the three sales representatives were assigned two lists of current and former Ididit dealers to contact in hopes of generating increased sales. The sales representatives also were provided a checklist to guide them on what to discuss during the calls.

Waterstraut and Weaver completed each of their lists shortly after receiving them. Plaintiff completed only part of one list, which Waterstraut subsequently completed. Plaintiff claimed the second list had been lost by the cleaning people. Nevertheless, Waterstraut testified during his deposition in this case that there was not a high rate of return on these calls made by sales representatives. (Pl.'s Resp. Ex. B at 18.) The majority of sales still were generated by calls to the sales representatives. (*Id.* at 18-19.)

By September 2008, Ididit's business conditions had deteriorated to a point where the Callison's became concerned about the corporation's ability to meet its payroll. As a result, the Callison's found it necessary to lay off employees in the front office and manufacturing. They met and "decided what areas [they] could reduce the work staff in and then [they] talked with other people and decided who would be laid off in that work

4

staff." (Pl.'s Mot. Ex. A. at 10.) The Callisons concluded that two of the five employees in the front office and six or seven manufacturing employees would be let go.[1] (*See, e.g.,* Def.'s Mot. Ex. A ¶ 6; Ex. H at 10.) With respect to the front office, the Callisons decided that they could lose one salesperson and a customer service representative. (Pl.'s Mot. Ex. A. at 12.) The Callisons assigned the task of selecting which manufacturing employees would be laid off to the general foreman in the machine shop. (Pl.'s Resp. Ex. A at 10.) They, however, did not ask Waterstraut or Lamoreaux to identify which employees should be terminated from the front office. (*Id.* at 12.) Jane Callison explained that Waterstraut and Lamoreaux were not consulted because she, along with her daughter Kimberly Johnson, are very close to what happens in the front office. (*Id.* at 12-13.) In affidavits submitted in support of Ididit's motion, the Callisons state that they analyzed whether to layoff Plaintiff or Weaver (they never considered laying off Waterstraut, the sales manager) and decided on Plaintiff. (Def.'s Mot. Ex. A ¶ 6; Ex. B. ¶¶ 4, 5; Ex. C. ¶¶ 3, 4.)

According to the Callisons, they chose to retain Weaver over Plaintiff based on a comparison of their sales statistics, Weaver's "embrace[]" of the new sales directive, and Weaver's "better communication style with customers." (*See, e.g., id.* Ex. A. ¶¶ 4-7.) With regard to sales statistics, Weaver's sales statistics were higher than Plaintiff's.

---

[1]The front office included employees other than the office manager and sales/customer service representatives. It does not appear, however, that the consideration of who to layoff went beyond those five employees.

(Def.'s Mot. Ex. D at 14.)  As to the new sales directive, Jane Callison observed that Weaver eagerly completed the phone calls on her lists, even generating some sales from those conversations, and created new sales ideas.  (*Id.* at 41-43.)  The Callisons claim that Weaver communicated with customers better than Plaintiff.  They explain that "Weaver was patient with customers and helped customers understand what they needed" whereas Burger "would talk down to customers and get frustrated with customers when they did not understand his explanation."  (*See, e.g.*, Def.'s Mot. Ex. A ¶ 7; Ex. B ¶ 5.)  Jane Callison testified during her deposition that another reason why Weaver was retained instead of Plaintiff was that Plaintiff  "created a lot of tension in the office.  He often came in with an attitude. And people were tiptoeing around him if he was in a bad mood." (*Id.* Ex. D. at 16.)

On September 22, 2008, Jane Callison and Ididit's Human Resources employee Maggie Seagraves, called Plaintiff, Brown, and Nikki Callison (Jane and Ken Callison's granddaughter who was working in the manufacturing area of the corporation) into a meeting.  The employees were informed that, due to the economy, they were being temporarily laid off.  (Def.'s Mot. Ex. H at 10.)  The employees were told to call in a week for information as to whether they should return to work or whether they would continue to be laid off.  (*Id.*)  Six or seven manufacturing employees also were laid off at this time.  (Def.'s Reply Ex. C at 10.)

Following the layoffs, Ididit determined that it had laid off too many employees to operate sufficiently.  In the front office, billings were not being done and there was no

employee capable of negotiating with customers.  (*Id*. Ex. D. at 36.)  Thus the Callison's decided to bring one front office employee back to work.  Ken Callison met with Waterstraut and Ididit's then-office manger, Laura Wright, to decide whether that employee should be Brown or Plaintiff.  (Def.'s Mot. Ex. F at 31-32.)  Waterstraut and Wright agreed that Brown should be brought back.  (*Id*. at 32.)  Waterstraut explained during his deposition: "Laura [Wright] was nowhere near as qualified to do Lorrie [Brown]'s job, she had only been there for a very short time, and it was very obvious that the administrative end of the office was really falling down badly without her there." (*Id*.)  In comparison, the reduced sales staff "was working just fine."  (*Id*. Ex. D at 37.) Additionally, during the week following the layoffs, the Callisons and other employees felt that the atmosphere in the front office was improved with Plaintiff's absence.  (*Id*. Ex. D at 34-35, 37-78; Ex. F at 36-37; Ex. I at 27-28.)  In the manufacturing area, all but two employees were eventually returned to work.

During the week after Plaintiff was laid off, he communicated with Waterstraut. In one of their conversations, Plaintiff expressed his belief that the decision to terminate him instead of Weaver was based on his gender.  (Pl.'s Resp. Ex. C at 31.)

According to Jane Callison, Seagraves advised that employees not called back after the first week should be "permanently laid off."  (Def.'s Mot. Ex. D at 58-59.)  A week after being laid off, Plaintiff contacted Ididit about his employment status and spoke with Seagraves.  She informed Plaintiff that he was being permanently laid off.  He responded that it must be a "woman thing."  (*Id*. Ex. O at 31, *see also* Ex. E at 33.)

7

Following his termination, Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). On September 28, 2010, the EEOC dismissed his charge and issued a right-to-sue letter. Plaintiff filed his Complaint in this matter on December 20, 2010, alleging the following claims: (I) sex discrimination in violation of Title VII; (II) sex discrimination in violation of ELCRA; (III) retaliation in violation of Title VII; and (IV) retaliation in violation of ELCRA.

## III.    Applicable Law and Analysis

### A.    Sex Discrimination

Ididit seeks summary judgment with respect to Plaintiff's sex discrimination claims brought pursuant to Title VII and ELCRA. Where, as here, a plaintiff lacks direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), to analyze both claims. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir.2003). First, the plaintiff must establish a *prima facie* case of discrimination by showing that: "'(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). To satisfy the first prong in a case where a member of the majority is claiming discrimination in violation of federal law, "the plaintiff must 'demonstrate background

8

circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Sutherland*, 344 F.3d at 614 (quoting *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir.2002) (additional quotation marks and citation omitted)). The same plaintiff alleging sex discrimination under Michigan's ELCRA, however, need not satisfy this arguably heightened standard of proof. *Lind v. City of Battle Creek*, 470 Mich. 230, 681 N.W.2d 334 (2004) (holding that under Michigan's statute, a reverse discrimination claim does not require a showing of "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority.")

The *prima facie* analysis is further modified in a case involving a "reduction in force." *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 767 (6th Cir. 2004). The Sixth Circuit has explained that "a true work force reduction case" arises "when business considerations cause an employer to eliminate one or more positions within the company." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (1990). In a reduction in force case, the plaintiff must present "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. . . . The evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [gender].'" *Gragg*, 373 F.3d at 767-78 (quoting *Barnes*, 896 F.2d at 1465). This additional requirement also applies to a plaintiff alleging a claim under Michigan's ELCRA. *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009).

9

If a plaintiff satisfies his burden of proving a *prima facie* case of gender discrimination, the employer must demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Sutherland*, 344 F.3d at 614-15. If the employer presents such proof, to succeed on his claim the plaintiff must demonstrate that the proffered reason is a pretext for discrimination. *Id*. at 615. There are three ways the plaintiff can make this showing: demonstrating that the stated reason (1) has no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), overruled on other grounds in *Geiger*, 579 F.3d 614.

Ididit challenges Plaintiff's ability to satisfy the first and fourth prongs of his *prima facie* case of reverse sex discrimination. As to the first prong– that Ididit is the unusual employer who discriminates against males– Plaintiff responds that this showing is satisfied where the termination decision was made by a woman. While Ididit claims that the Callisons, jointly, made the decision to terminate Plaintiff instead of Weaver, this Court finds a genuine issue of material fact as to whether this is accurate. Evidence suggests that the Callisons jointly decided to terminate two people from the front office and approved the final decision regarding who to terminate but that Jane Callison– with Kimberly Johnson's assistance– selected which employees to terminate. The Sixth Circuit has found the fact that the decision-maker was of the opposite race or gender sufficient to satisfy the "background circumstances" requirement. *Zambetti*, 314 F.3d at 257. Moreover, there is evidence that Jane Callison specifically wanted to fill the sales

10

representative position with a woman.  (Pl.'s Resp. Ex. M at 21-22; Ex. C at 68-69.)

The Court, however, does not find Plaintiff's other evidence of Jane Callison's favoritism towards women persuasive.  Plaintiff's complaint that Jane Callison allowed female employees more frequent breaks relates to female employees who took breaks to smoke.  This does not distinguish male employees from female employees; rather, it distinguishes between smoking and non-smoking employees.  While Plaintiff is aware of a male employee who allegedly expressed an interest in a position that went to a woman, he lacks evidence that the male employee actually applied for the position and he presents no evidence of any male employee applying for a position and being denying the opportunity.  Finally, with respect to a female employee's inappropriate touching of other employees (Plaintiff and others, including other female employees), the evidence reflects that Ididit addressed the complaints and the behavior thereafter stopped.

As to the modified fourth prong of his *prima facie* case, Plaintiff first responds that this is not a reduction in force case.  This Court cannot agree, as the undisputed evidence demonstrates that, due to business considerations (i.e. a sharp decline in sales) the Callisons decided to eliminate several positions from the corporation.  Nevertheless, based on the evidence discussed above, the Court finds a genuine issue of material fact as to whether Ididit selected Plaintiff as part of its reduction in force because of his gender.

Even if Plaintiff demonstrates a *prima facie* case of gender discrimination, Ididit contends that it had legitimate non-discriminatory reasons for choosing him over Weaver for termination: (1) Weaver's higher sales statistics; (2) Weaver's enthusiastic acceptance

11

2:10-cv-15053-PJD-PJK   Doc # 18   Filed 10/17/11   Pg 12 of 18   Pg ID 308

and performance of the new sales directive; and (3) Weaver's superior communication skills with customers.

In response, Plaintiff presents evidence to show that Ididit's reliance on Plaintiff's and Weaver's sales statistics was pretextual. Plaintiff demonstrates that the sales representative sitting closest to the fax machine (Weaver and the sales representative she replaced) generally had the highest sales numbers, regardless of that person's sales abilities. (Pl.'s Resp. Ex. G; Ex. H ¶ 14.) As Lamoreaux, Ididit's office manager, explained during her deposition, the person sitting next to the fax machine did not have to do anything for the sales they entered but grab the orders from the fax machine. (*Id*. Ex. F at 42.) Lamoreaux testified that she therefore does not believe that the sales numbers accurately reflect a sales representative's value. (*Id*.) Waterstraut, Ididit's sales manager, in fact did not use the sales numbers when evaluating the sales representatives. (*Id*. Ex. B at 40.)

As to Ididit's other two reasons, Plaintiff presents evidence to raise a genuine issue of material fact as to whether they had a basis in fact or were sufficient to motivate Ididit's decision. First, Plaintiff shows the Waterstraut, the sales manager, believed that Weaver should have been terminated instead of Plaintiff. (Pl.'s Resp. Ex. B at 34.) Lamoreaux, the office manager, thought that Plaintiff was better than Weaver at the sales representative job. (*Id*. Ex. F. at 34.) A comparison of Plaintiff's and Weaver's performance evaluations near the time of Plaintiff's termination further supports their views of the two employees. (*See id*. at Exs. J-L.) Finally, while Ididit asserts that

12

Plaintiff was sometimes difficult to work with and that the atmosphere in the front office improved without him, the Court finds a genuine issue of material fact as to whether this, alone, could support Ididit's termination decision.

For the above reasons, the Court finds genuine issues of material fact precluding summary judgment in Ididit's favor on Plaintiff's Title VII and ELCRA gender discrimination claims (Counts I and II).

### B. Retaliation

Plaintiff's Title VII and ELCRA retaliation claims relate to his initial layoff and subsequent permanent layoff or termination. Plaintiff claims that he was initially laid off in retaliation for his repeated complaints about what he deemed to be preferential treatment of female employees in the front office. He asserts that his temporary layoff became permanent in retaliation for his complaint to Waterstraut that the first decision was gender-based.

Absent direct evidence, as is the case here, the *McDonnell Douglas* burden-shifting analysis that applies to Plaintiff's discrimination claims apply to his retaliation claims. To establish a *prima facie* case of retaliation, Plaintiff must show "(1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002) (citing *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 877 (6th Cir.1991)). To

13

satisfy the causal connection requirement, Plaintiff "must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had [he] not [engaged in protected activity]." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citations omitted). Michigan courts assess retaliation claims under the ELCRA using the same general framework; however, the Michigan Court of Appeals has held plaintiffs to a higher standard of causation. A plaintiff alleging a retaliation claim under the ELCRA "'must show that his participation in activity protected by the ELCRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two.'" *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523, n.2 (6th Cir. 2008) (quoting *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001)).

With respect to his initial layoff, to show that he engaged in protected activity, Plaintiff relies on his complaints to Waterstraut and Lamoreaux about what he perceived as unfair treatment based on sex. This included his complaints in 2005 about a female employee's inappropriate touching of employees and his complaints at an unspecified time about excessive smoking breaks afforded to female employees. The former complaints are too far removed (three years) to suggest a causal connection with Plaintiff's termination and Plaintiff lacks any evidence to otherwise demonstrate a connection. Moreover, everyone in the front office apparently complained about the employee's conduct. (*See* Def.'s Mot. Ex. F at 29-30; Ex. G at 28-29.) Plaintiff's complaints about excessive breaks were perceived as complaints about smokers rather

14

than women.  (*See id*. at 23, G at 25.)  Additionally, Lamoreaux testified during her deposition that she also shared Plaintiff's complaint about smoking breaks and voiced her complaint to Kimberly Johnson on her own behalf, without mentioning Plaintiff.  (*See id*. Ex. G at 25-26.)

Plaintiff also relies on his complaints to Cynthia Farmer, Ididit's head of Human Resources, that Weaver was given preferential treatment in the workplace.  (Pl.'s Resp. Ex. M at 13-14.)  Plaintiff presents no evidence, however, that Farmer shared his complaints with anyone involved in the decision to lay-off Plaintiff, or anyone else at Ididit.[2]

Relying on Jane Callison's statement during her deposition that Plaintiff "had just a negative way about creating– just creating issues in the sales office" (Pl.'s Resp. Ex. D at 23), Plaintiff further argues that "[a] reasonable jury could find that one way [Plaintiff] created 'issues' was by complaining about what he deemed to be discriminatory treatment of males."  (Pl.'s Resp. Br. at 18.)  There is no evidence, however, that the "issues" to which Jane Callison was referring related in any way to gender discrimination.  In fact, the evidence suggests that Jane Callison instead was simply referring to Plaintiff's general attitude.  (*See, e.g.*, Def.'s Mot. Ex. D at 16 (Jane Callison explaining that Plaintiff created tension in the office because people had to "tiptoe[] around him" if he was in a

---

[2]Plaintiff also complained to Waterstraut that Weaver was shown favoritism. (Def.'s Mot. Ex. F at 26-27.)  Waterstraut did not discuss Plaintiff's concerns with the Callisons, however.  (*Id*. at 28-29.)

bad mood); Ex. F at 37-38 (Waterstraut explaining that Plaintiff "is an intense guy" and would let internal and external things get to him and that would affect the mood of everyone around him pretty much.)

With respect to his permanent layoff or termination, Plaintiff contends that this decision was made in retaliation for his complaints to Waterstraut that his initial lay-off was gender-based.[3]  Ken Callison consulted Waterstraut about whether to bring back Plaintiff or Brown, when it became apparent that the front office could not function with three people.  (Def.'s Mot. Ex. F. at 31.)  There is no evidence, however, that Waterstraut shared Plaintiff's purported complaint of gender discrimination with Ken Callison or anyone else at Ididit.  Plaintiff nevertheless argues that "a jury could find that this report [i.e., Plaintiff's complaint to Waterstraut] was forwarded to the Callison family."  (Pl.'s Resp. Br. at 19.)  Such a conclusion would constitute impermissible speculation by a jury. In any event, Ididit demonstrates that the decision to bring Brown rather than Plaintiff back to work (which the evidence suggests was made by Ken Callison, Waterstraut, and Laura Weaver (then the office manager) was based on a legitimate, non-retaliatory reason.  Specifically, Weaver lacked the skills and experience to handle the administrative end of the office that Brown previously was responsible for and, as a result, tasks were not getting done on that end; whereas, the sales representatives' responsibilities were

---

[3]Although Waterstraut does not recall Plaintiff expressing that he thought Weaver was retained over him because of her gender (*see* Def.'s Mot. Ex. F at 35), the Court accepts for purposes of Ididit's motion Plaintiff's testimony that he did tell Waterstraut that he thought the decision was sex-based.

being handled in Plaintiff's absence without difficulty by Waterstraut and Wright. (Def.'s Mot. Ex. F. at 32, Ex. D at 35.)

Moreover, when it first laid off employees, Ididit informed those employees to contact the company in a week to determine whether they would be recalled to work. (Def.'s Reply Ex. C at 10.)  Further, in addition to Plaintiff, Ididit permanently terminated two employees sometime after the initial lay-off.  (*Id.*)  These facts undermine a causal connection between Plaintiff's complaint that he believed his initial layoff was gender-based and the decision one week later to permanently terminate him.

For the above reasons, the Court concludes that Plaintiff cannot establish a *prima facie* case of retaliation (Counts III and IV).

**IV.    Conclusion**

As set forth above, the Court finds genuine issues of material fact precluding summary judgment in Ididit's favor with respect to Plaintiff's gender discrimination claims under Title VII and Michigan's ELCRA.  With respect to Plaintiff's federal and state retaliation claims, however, the Court concludes that there are no genuine issues of material fact and that Ididit is entitled to judgment as a matter of law with respect to these claims.

Accordingly,

**IT IS ORDERED**, that Defendant Ididit Inc.'s motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** in that Counts III and IV of Plaintiff's Complaint are **DISMISSED WITH PREJUDICE**.

Date:  October 17, 2011                    s/PATRICK J. DUGGAN
                                           UNITED STATES DISTRICT JUDGE

Copies to:
David M. Blanchard, Esq.
Edward A. Macey, Esq.
C. Philip Baither III, Esq.

18